**Timothy A. GOGNAT, Petitioner**

**v.**

**Chet J. ELLSWORTH, Joanne Ellsworth, Stephen Smith, and MSD Energy Inc., Respondents.**

**No. 09SC963.**

Supreme Court of Colorado, En Banc.

June 6, 2011.

Irwin & Boesen, P.C., Brad R. Irwin, Chris L. Ingold, Denver, Colorado, Attorneys for Petitioner.

David L. McCarl, John P. Lange, Denver, Colorado, Attorneys for Respondents Chet J. Ellsworth, Joanne Ellsworth and MSD Energy, Inc.

Hall & Evans, LLC, Michael W. Jones, Bruce A. Menk, Alan Epstein, Denver, Colorado, Attorneys for Respondent Stephen Smith.

Justice COATS delivered the opinion of the Court.

Gognat sought review of the court of appeals' decision affirming the district court's summary judgment in favor of Smith. *See Gognat v. Ellsworth,* 224 P.3d 1039 (Colo. App.2009). The district court ruled that Gognat's trade secret misappropriation claim was barred by the statute of limitations. The court of appeals affirmed, holding that the various acts of misappropriation alleged

in the complaint constituted multiple misappropriations of either a single trade secret or related trade secrets, the limitations period for which accrued at the time Gognat acquired knowledge of the defendant's first act of misappropriation.

Because the meaning of the term "trade secret" as used in the Colorado's Uniform Trade Secrets Act is a matter of law, to be determined by the court, and because undisputed facts demonstrate that all of the proprietary information alleged to have been misappropriated in this case constituted a single trade secret, the misappropriation of which was known to the plaintiff more than three years prior to filing his complaint, the judgment of the court of appeals is affirmed.

## I.

Timothy A. Gognat filed a civil action in December 2005, naming a number of defendants, including Chet J. Ellsworth, Stephen Smith, and MSD Energy, Inc., and asserting, among other things, a claim of trade secret misappropriation. Following the dismissal of Gognat's claims against the other parties for lack of personal jurisdiction, Smith moved for summary judgment, asserting both the expiration of the applicable statute of limitations and the preemption of a number of Gognat's other claims by Colorado's Uniform Trade Secrets Act. Although it initially denied the motion, upon reconsideration following a second deposition of Gognat, the district court concluded that no genuine issue of material fact precluded it from entering summary judgment on Gognat's misappropriation claim based on his knowledge of certain acts of misappropriation by the defendants more than three years prior to commencing his lawsuit.

In his complaint, Gognat alleged that Smith introduced him to Ellsworth in the mid–1990's, and in 1997 he disclosed to Ellsworth proprietary information, described as a methodology for identifying and extracting reserves of oil and natural gas in western Kentucky. More particularly, the complaint alleged that the information Gognat developed "relating to probable reserves of oil and natural gas in the Western Kentucky Area included technical, geological, geophysical,

and business information and existed in both an oral and documentary form (e.g., maps, charts, logs, seismographs, interpretations, calculations, summaries, opinions, and other written or charted means)." It further alleged that at the time Gognat shared this information with Ellsworth, the two men entered into a joint venture to use Gognat's information to profitably develop the probable reserves of oil and natural gas in the Western Kentucky Area and that, in that same year, Ellsworth formed MSD Energy, Inc.

The complaint also contained a number of factual allegations concerning Smith's involvement, the use of Gognat's information by the defendants to acquire permits and develop wells in the Western Kentucky Area without informing Gognat, and Gognat's discovery of and reaction to those activities. By January 2001, Gognat was aware that Smith was associated with the joint venture and that Ellsworth and Smith had discussed Gognat's proprietary information in connection with obtaining additional finances. In response to MSD's assignment of company interests in May of that year, Gognat objected that his compensation was not consistent with the terms of the joint venture, and he threatened to bring legal action against Ellsworth unless he were appropriately compensated for his trade-secrets contribution. By Gognat's own account, rather than initiating legal action, he continued to rely on the assurances of Ellsworth and Smith that their differences would be worked out fairly.

The complaint asserted that between 2001 and 2005, despite establishing a number of functional and producing wells, the defendants downplayed the value of their commercial exploitation of oil and gas in the subject areas and failed to compensate Gognat for the use of his trade secrets. It specifically alleged that between 1997 and 2001, the defendants "misappropriated" these trade secrets by acquiring leases in the Western Kentucky Area without adequately compensating him as agreed. In the summer of 2005, however, when beginning work with a different partner to develop another area within the Western Kentucky Area, Gognat allegedly discovered the defendants' involve-

ment in that area as well, and upon further investigation, he discovered even more extensive activities being conducted by the defendants in the first area.

In moving for summary judgment, Smith relied on the allegations of the complaint and Gognat's testimony in his first deposition in asserting that no disputed issues of material fact existed concerning the timing of either the defendants' activities in the Western Kentucky Area or Gognat's knowledge of those activities. He noted that Gognat admitted to knowing in 2000, if not earlier, that the defendants were drilling wells in the Western Kentucky Area and that Gognat had on multiple occasions in 2002 threatened legal action based on "the usurpation of [Gognat's] proprietary data."

Although Gognat did not dispute Smith's key factual assertions concerning the timing of his knowledge, he opposed the summary judgment motion by attempting to distinguish the two areas geographically, geologically, and generally by the engineering techniques involved in extraction. Gognat claimed that, notwithstanding his early knowledge of the defendants' activities in the first area, he was completely unaware of, and had no reason to suspect, their activities in the second area until 2005. He also contended that his suit against Smith was premised solely on those later-discovered activities in the second area.

The district court initially denied the summary judgment motion, concluding that a material dispute of fact existed regarding the accrual of Gognat's cause of action. Following Gognat's second deposition, however, Smith moved for reconsideration on the grounds that Gognat himself conceded the development of the two areas in western Kentucky were "all part of the same overall concept" and that he first learned of the defendants' misappropriations of his trade secret in 1997. The district court agreed and granted summary judgment to Smith based on the three-year statute of limitations.

On direct appeal, the court of appeals affirmed the district court's summary judgment, interpreting the applicable statute of limitations to prescribe a single accrual date for multiple misappropriations of either a single trade secret or multiple, related trade secrets, coinciding with the date the plaintiff first has knowledge of an act by the defendant that would allow a jury to reasonably infer misappropriation.

We granted Gognat's petition for a writ of certiorari on the question whether the district court's order of summary judgment was appropriate in this case.

## II.

█ In this jurisdiction, actions for damages or injunctive relief from the misappropriation of trade secrets are governed by statute. *See* §§ 7–74–101 to –110, C.R.S. (2010) ("Uniform Trade Secrets Act"). The Act expressly defines both "misappropriation" and "trade secret" and provides a specific statute of limitations for actions alleging the misappropriation of trade secrets. *See* §§ 7–74–102, –107. Precisely what constitutes the misappropriation of a trade secret in this jurisdiction and when an action for misappropriation accrues are therefore matters of legislative intent, as expressed in the language of the applicable statutes. *See Holcomb v. Jan–Pro Cleaning Sys. of S. Colo.*, 172 P.3d 888, 890 (Colo.2007); *see also BP Am. Prod. Co. v. Patterson*, 185 P.3d 811, 814 (Colo.2008) (construing statutory designation of accrual dates). Because Colorado's Act was modeled after the Uniform Trade Secrets Act ("UTSA") of the National Conference of Commissioners on Uniform State Laws, *see* Unif. Trade Secrets Act (amended 1985), 14 U.L.A. 529–30 (2005); Ch. 63, sec. 1, 1986 Colo. Sess. Laws 460–62, the official comments of the National Conference provide some background for virtually identical provisions of the Colorado Act.

"Misappropriation" is defined broadly to include the "acquisition" of a trade secret by anyone who has reason to know it was acquired by improper means, as well as the "disclosure" or "use" of a trade secret without consent by anyone who acquired it improperly or had reason to know that his knowledge of it came from someone who got it improperly or under circumstances giving rise to a duty to either keep it secret or limit

its use. *See* § 7–74–102(2).[1] "Trade secret" is defined equally broadly to include all or part of virtually any information that is of value, whether it be in the nature of scientific, technical, business, financial, or professional information, as long as the owner has taken measures to prevent it from becoming available beyond those to whom he has given limited access. *See* § 7–74–102(4).[2]

The statute of limitations expressly included in the Act requires an action for misappropriation to be brought within three years after it is, or by the exercise of reasonable diligence should have been, discovered. § 7–74–107. Significantly, the statute also specifies that for purposes of this limitations period, a "continuing misappropriation" constitutes a single claim. *Id.* Were it not sufficiently clear from the statutory language itself, the official comment of the National Conference emphasizes that the Conference intended to reject a continuing wrong approach, in which a new limitation period could begin at the time each separate act of misappropriation occurred, *see* Unif. Trade Secrets Act § 6 cmt. (amended 1985), 14 U.L.A. 649–50 (2005), and the Colorado General Assembly adopted this limitations provision without further amendment.

■ As a matter of structure and drafting technique, there can be little doubt that the combination of these three things—defining a trade secret as the whole or any portion or phase of virtually any valuable information intended to be kept confidential; defining misappropriation to include virtually any improper acquisition, disclosure, or use of a trade secret; and defining a single claim for purposes of the limitations period as including continuing misappropriations—evidences a design, or legislative intent, to discourage the differentiation of various acts of misappropriation and the proliferation of misappropriation claims. While it represents an important policy choice, the legislative decision to measure the limitations period for continuing misappropriations from the initial discovery of a single act of misappropriation has the clear effect of precluding an injured party from delaying until the misuse of his trade secret has become sufficiently profitable to make his resort to legal action economically worthwhile. *See Intermedics, Inc. v. Ventritex, Inc.*, 822 F.Supp. 634, 652 (N.D.Cal.1993) (statute of limitations may be triggered even if misappropriation is "relatively inconsequential" and would not, by itself, justify the cost of suit). Despite this clear statutory design, however, the question remains, with regard to the facts and circumstances of each individual claim, whether any specific act of misappropriation constitutes a continuing misappropriation of the same trade secret or the separate and distinct misappropriation of a different trade secret.

---

1. The Act defines "misappropriation" to mean:

   (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

   (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

   (I) Used improper means to acquire knowledge of the trade secret; or

   (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:

   (A) Derived from or through a person who had utilized improper means to acquire it;

   (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

   (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

   (III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

   § 7–74–102(2).

2. The Act defines "trade secret" to mean:

   the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

   § 7–74–102(4). Although Colorado's definition of "trade secret" does not differ from the UTSA's definition in any significant respect, the General Assembly utilized the definition in Colorado's theft of trade secrets statute, *see* § 18–4–408(2)(d), C.R.S. (2010), rather than the UTSA's definition.

█ In the civil context, whether a claim is barred by the expiration of an applicable statute of limitations is generally held to be a question of fact for the jury. *See Mastro v. Brodie*, 682 P.2d 1162, 1169 (Colo.1984) (citing *Owens v. Brochner*, 172 Colo. 525, 474 P.2d 603 (1970); and *Davis v. Bonebrake*, 135 Colo. 506, 313 P.2d 982 (1957)). The interpretation of the statutory definition, and therefore the scope, of a "trade secret," however, is a question of law for the court. *See Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 641 (Colo.1988); *Stanske v. Wazee Elec. Co.*, 722 P.2d 402, 407 n. 2 (Colo.1986). Although the nature of any particular piece of proprietary information, especially "any scientific or technical information, design, process, procedure, formula, [or] improvement," § 7–74–102(4), may be heavily dependent on scientific or historical facts, the determination whether minor variations in that design, process, procedure, formula, or improvement, as used or disclosed by the defendant on separate occasions, are sufficient to justify the classification of each as a different trade secret presents a question of law for the court. Where there is no genuine dispute of historical or scientific fact concerning the nature of the proprietary information used by the defendant on different occasions and there is no genuine dispute that the plaintiff was aware of an act of misappropriation by the defendant more than three years before the complaint was filed, the question whether an action alleging subsequent acts of misappropriation should be barred by the statute of limitations is therefore properly postured for summary judgment. *See Andersen v. Lindenbaum*, 160 P.3d 237, 239 (Colo.2007); *see also Safehouse Progressive Alliance for Nonviolence, Inc. v. Qwest Corp.*, 174 P.3d 821, 825 (Colo.App.2007) (affirming summary judgment in trade secret misappropriation case because no material facts in dispute).

█ Because the term "trade secret" is defined, in pertinent part, to include *the whole*, as well as any portion or phase, of any valuable and secret scientific or technical information, the words of the statute themselves mandate that any particular part of such information be considered a trade secret, but they do not permit different portions or phases of one trade secret to be classified as different trade secrets. Because, however, virtually any two pieces of information can be conceived of as constituent elements of some ·greater whole, arbitrariness in the differentiation of designs, processes, procedures, formulas, or improvements can be avoided only by applying a level of abstraction appropriate to the purposes of Act. *Cf. In re Title, Ballot Title, Submission Clause for 2009–2010 No. 91*, 235 P.3d 1071, 1077 (Colo.2010) (assessing whether initiative included more than one subject by reference to the abuses the single-subject requirement was designed to prevent). While some courts continue to search for meaningful differences between one trade secret and another, *see, e.g., Forcier v. Microsoft Corp.*, 123 F.Supp.2d 520, 526 (N.D.Cal. 2000), others have seemingly abandoned the effort as inherently arbitrary, seeking instead to give meaning to the notion of a "continuing misappropriation" by reference to other considerations altogether. *See Intermedics, Inc.*, 822 F.Supp. at 653–54.

Notably, in *Intermedics*, the United States District Court for the Northern District of California construed California's interpretation of its own version of the Uniform Trade Secrets Act to focus on the "confidential relationship" between the holder of secret information and the persons to whom that information is imparted, rather than on concepts of property law. 822 F.Supp. at 653. After much discussion of that objective, it concluded that "once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should understand that there is a risk that that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences." *Id.* at 654. To the extent that the underlying rationale of *Intermedics* suggests the treatment of every subsequent act of misappropriation by the same defendant as a continuing misappropriation, regardless of the nature of the particular trade secrets involved, the actual language of the Uniform Trade Secrets Act is insufficiently malleable to fully accommodate that rationale.

Notwithstanding the breadth of its underlying rationale, however, the actual holding of *Intermedics* is couched in terms of trade secrets shared by the plaintiff "with defendants during the same period and in connection with the same relationships *and when the trade secrets concern related matter.*" *Id.* at 657 (emphasis added); *see also HiRel Connectors, Inc. v. United States*, 465 F.Supp.2d 984, 988 (C.D.Cal.2005) (initial misappropriation is accrual point when plaintiff brings suit for "separate misappropriations of *related* trade secrets" (emphasis added)); *Forcier*, 123 F.Supp.2d at 526 ("the alleged trade secrets at issue all are *related*" (emphasis added)). Relying on the holding of *Intermedics*, the court of appeals below similarly construed section 7–74–107 "to provide for a single accrual date for multiple misappropriations of a single trade secret or of multiple, *related* trade secrets." *Gognat*, 224 P.3d at 1046 (emphasis added). For purposes of the limitations period, the court of appeals therefore found it to be of no consequence whether the acts of misappropriation alleged by Gognat were "multiple misappropriations of a single trade secret or multiple misappropriations of multiple (but related) trade secrets." *Id.* at 1047.

Even as limited to "related" trade secrets, the appellate court's rule is too broad. The statute fixes an accrual date for an "action for misappropriation of *a trade secret*", and its subsequent reference to a "continuing misappropriation" is clearly limited to the continuing misappropriation of that same trade secret. § 7–74–107 (emphasis added). Consistent with the statutory language, therefore, multiple acts of misappropriation constitute a "continuing misappropriation," and consequently a single claim within the meaning of the statute, only to the extent that the processes, procedures, or other pieces of information used in each separate act of misappropriation are related to each other as portions or phases of a single trade secret—not merely as related trade secrets. *Cf. Cadence Design Sys., Inc. v. Avant!*

*Corp.*, 29 Cal.4th 215, 127 Cal.Rptr.2d 169, 57 P.3d 647, 651–54 (2002) (answering a certified question of the Ninth Circuit Court of Appeals by affirming California's focus on the "confidential relationship" itself but opining only on the accrual date of multiple acts of misappropriation of a single trade secret—not multiple related trade secrets).[3]

The difference between "related trade secrets" and related designs, processes, procedures, formulas, and improvements themselves, however, may be largely a matter of terminology. In either case, avoiding arbitrariness in differentiating one from another requires a rationale basis or controlling principle consistent with the purposes of the statutory accrual rule. While the actual language of the statute may not classify a subsequent misappropriation of related trade secrets as a single claim, the distinction between related trade secrets and the related pieces of proprietary information forming a single trade secret would appear to be subtle at best.

We cannot find that the words of the Act admit of a construction requiring, by reason of the confidential relationship alone, the designation of all proprietary information disclosed by the same plaintiff to the same defendant as one trade secret. Nevertheless, circumstances surrounding the acquisition or disclosure of proprietary information, like the nature, timing, and reasons for the disclosure, clearly permit reasonable inferences about the unity or relatedness of the information disclosed. In the absence of any contention that the disclosure was made, for instance, to someone in the business of buying and selling trade secrets of various kinds, or that different parts of the secret information or process were discovered or developed at distinctly different times, for distinctly different purposes, and using distinctly different experiments or analyses, the fact that a body of secret information was disclosed to the same individual, at the same time, normally provides a powerful reason for treating it as a single trade secret. And the disclo-

---

3. Of course separate trade secrets might be related in such a way as to suggest that the discovery of the misappropriation of one could arguably indicate that, with reasonable diligence, the misappropriation of the other should be discovered as well. Such a relationship would, nevertheless, result in another, rather than a continuing, misappropriation and could never result in the accrual of an action before the related misappropriation had even occurred.

sure of a body of proprietary information in exchange for an agreement to embark on a joint commercial venture to profit from the development or application of that information offers perhaps the strongest or most natural reason for treating all of the subject information as the same trade secret for purposes of the statutory limitations period. *See Forcier*, 123 F.Supp.2d at 526 (determining trade secrets were "related" in part because duties giving rise to misappropriation claim arose through "one relationship").

The very breadth of the statutory definitions of both "misappropriation" and "trade secret" makes it impractical, and on these facts unnecessary, to attempt an enumeration of all possible factors, and the weight to be given each, relevant to determining whether multiple acts of misappropriation involving the same parties constitute the continuing misappropriation of a single trade secret or separate misappropriations of different trade secrets. Each case will require the court's evaluation of the totality of the circumstances, with reference to the purposes of the statute. But both the specific provisions and overall structure of the Act militate against dividing into multiple trade secrets a single body of proprietary information disclosed to the same person, at substantially the same time, and in furtherance of the same commercial venture.

### III.

■ There is no dispute that by early 2001 at the latest Gognat was aware of acts by the defendants, including Smith, which he characterizes as the misappropriation of his trade secrets. Similarly, there is no dispute that Gognat voluntarily shared the information he characterizes as his trade secrets with Ellsworth in substantially the same time period in 1997, as part of an agreement to enter into a joint venture to profitably develop the probable reserves of oil and natural gas in the Western Kentucky Area. Gognat has defended against Smith's motion for summary judgment throughout solely on the theory that the trade secrets he knew to be misappropriated as early as 2001 were different from those whose misappropriation he did not discover until 2005, and therefore his action for misappropriation of the latter secrets did not accrue at the time of his earlier discovery.

Although Gognat asserts that the relationship between the trade secrets used by the defendants at different times and in different locations presents a genuine dispute of fact, the record reflects no dispute about the scientific or historical facts concerning the nature of the operations in each area. Gognat's deposition testimony concerning the geographical separation of the two areas, as well as his testimony concerning the geological differences between them, went unchallenged. Even his testimony concerning differences in the drilling techniques required in each area was not disputed. The only dispute between the parties, both below and in this court, has been over the legal characterization of the defendants' acts in the second area as either the misappropriation of an additional trade secret or a continuing misappropriation of the same trade secret.

While the district court may have been heavily influenced by Gognat's second deposition, in which he suggested that even he considered the confidential information used with regard to each area to involve substantially the same concept, the undisputed facts established that all of the proprietary information allegedly misappropriated by the defendants amounted to a single trade secret within the meaning of the Act. All of the information was shared with the same person, in substantially the same time period, as part of the same joint commercial venture to develop oil and natural gas reserves in western Kentucky. Although Gognat testified to differences in the operations in the two areas, he offered nothing to indicate that those differences involved designs, processes, procedures, formulas, or improvements that were secret, much less that they were developed by him in a manner that made them meaningfully separate and distinct. It is therefore unnecessary for us to resolve whether the continued use of confidential information disclosed to the same person, at the same time, and as part of the same commercial venture could, under some set of circumstances, be divided into multiple trade secrets for purposes of the statutory limita-

tions period. To resolve the matter before us today, it is enough that no such justification appears in the record of this case.

## IV.

Because the meaning of the term "trade secret" as used in the Colorado's Uniform Trade Secrets Act is a matter of law, to be determined by the court, and because undisputed facts demonstrate that all of the proprietary information alleged to have been misappropriated in this case constituted a single trade secret, the misappropriation of which was known to Gognat more than three years prior to filing his complaint, the judgment of the court of appeals is affirmed.